IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :
                             :
       Plaintiff,            :   Criminal No. 3:12-104
                             :
  vs.                        :
                             :
MARK ANTHONY SIEVERT,        :   TRANSCRIPT OF HEARING
                             :
       Defendant.            :
- - - - - - - - - - - - - - -X

                                Second Floor Courtroom
                                United States Courthouse
                                131 East Fourth Street
                                Davenport, Iowa  52801
                                Thursday, January 16, 2014
                                2:30 p.m.


BEFORE:  THE HONORABLE JAMES E. GRITZNER, Chief Judge.


APPEARANCES:

For the Plaintiff:            CLIFFORD R. CRONK, III, ESQ.
                              Assistant U.S. Attorney
                              U.S. Courthouse, Suite 310
                              131 East Fourth Street
                              Davenport, Iowa  52801

For the Defendant:            ANNE M. LAVERTY, ESQ.
                              Mullin & Laverty
                              1636 42nd Street NE
                              Cedar Rapids, Iowa  52402



                   Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                      Room 189, U.S. Courthouse
                       123 East Walnut Street
                       Des Moines, Iowa  50309

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
| --- | --- | --- |
| 1 - Search warrant affidavit | 19 | 19 |

| DEFENDANT'S EXHIBIT NUMBERS: | | |
| --- | --- | --- |
| A through E - Photographs | 13 | 13 |

P R O C E E D I N G S

(In open court, with defendant present.)

THE COURT: Take a seat, please.

We are convened in the matter of the United States versus Mark Sievert, Criminal No. 12-104, on the defendant's motion to suppress and also the defendant's motion for a bill of particulars.

Starting first with regard to the bill of particulars, Counsel, given the response to the motion to suppress and the access to the discovery file, is the bill of particulars still necessary?

MS. LAVERTY: Your Honor, if counsel is willing to talk with me further about some of the issues that I identified in it, I think we can probably just renew the motion if there's some dispute. I think in my motion I indicated that typically the government would rely upon a particular image or images as evidence of, say, a production or a possession count, and in this case we have a very large file with lots of stuff in it, and I don't know exactly which, if any, images that the government is going to rely upon. That's frustrating. I don't think it's necessarily up to me to divine that from the government; the same thing with the enticement or attempted enticement counts. I think the government's response generally addresses those issues, but perhaps I can get additional information from counsel for the government.

1      THE COURT:  All right.  It seems to me at this point
2 in time, based upon what is disclosed in the record and the
3 access to the discovery, that the motion for bill of particulars
4 should be denied.  If it is still necessary, you can reassert
5 that at a later time, but for now that motion will be denied.
6      That brings us then to the motion to suppress.  Does
7 the government wish to present evidence, Mr. Cronk?
8      MR. CRONK:  I filed two items for the court.  One was
9 an affidavit from Bruce McChesney and the other was the search
10 warrant.  On the face of the motion to suppress, it appears that
11 the defense is arguing that there was something improper done
12 when the police went to the residence of 1029 Ripley to arrest
13 the defendant and at that time they violated his Fourth
14 Amendment rights, but it's very -- it's not clear to me how they
15 could have violated his rights at that time and they didn't
16 seize anything when they arrested him.  All the evidence that
17 was seized was either voluntarily taken by Mr. McChesney -- the
18 computer towers from the living area were provided to the agents
19 that day, and then on the 21st when they came back, they seized
20 all the evidence pursuant to a search warrant which I provided
21 to the court.
22      It's the defendant's burden to show that there's
23 something wrong with that search warrant, whether there's
24 something wrong with what happened here.  Given that, the
25 government feels like we have no burden of proof or persuasion

since we've established that these items were seized pursuant to a warrant.

THE COURT: Ms. Laverty, precisely what is it that you're looking to suppress?

MS. LAVERTY: Your Honor, the items that were initially identified by agents in what we believe to be an unlawful search of the defendant's bedroom would include -- again, we don't know exactly what each agent may have seen, but we do know that there were cell phones that were in the room and that were sought and eventually taken. Also there is a notebook that has been identified as potentially a piece of evidence in this case. I don't know if there are other items that the agents saw and then subsequently put it into a search warrant, but essentially they wouldn't have known about that stuff if they hadn't been digging around in his dresser and in his room during the arrest procedure.

THE COURT: Well, there's no doubt, is there, that they would have had the right to enter the room in the process of doing a protective sweep of the residence?

MS. LAVERTY: They would have had to at least check out the room in doing a protective sweep, that's true.

THE COURT: Right. And places where a person might be, and I know that doesn't involve drawers, but it would involve a closet or under the bed, places like that?

MS. LAVERTY: Yes.

1  THE COURT: So that's really not at issue. The
2  concern here is that your allegation is that the officers
3  actually began searching in drawers before the defendant
4  actually returned to the room to change his clothes?
5  MS. LAVERTY: Yes. The room is -- in my motion I
6  think I identified it as being down a hall. It's actually a
7  much smaller residence than that. So it's a room that's closed
8  off by just a curtain and --
9  THE COURT: It's a mobile home, right?
10  MS. LAVERTY: It's a mobile home, right. So the
11  agents entered that room either while or immediately after the
12  defendant was placed into handcuffs in the main room of the
13  home. They went into that room. The defendant was in boxers
14  and a T-shirt, and he then -- it was identified you should
15  probably put some pants on before we go down to the jail because
16  it's November. So he then was taken into the room immediately
17  adjacent, and in there he sees a couple of agents digging
18  through drawers, looking in the closet, and one of them I think
19  was also looking through a wallet. Now, at the foot of the
20  defendant's bed -- and it's not that big a room -- was a pair of
21  trousers, and I'm not sure, but they may have been the trousers
22  that he actually put on eventually to go to jail. So there's no
23  reason that the officers would have needed to dig around in his
24  drawers and in any case they shouldn't have been back there
25  before he was there.

1      MR. CRONK: Then, Your Honor, Mr. Sievert should get
2 on the witness stand and testify.
3      THE COURT: Well, we're getting there.
4      MR. CRONK: Okay.
5      THE COURT: Do you wish to present evidence?
6      MS. LAVERTY: Well, Your Honor, if it is as we have
7 alleged a warrantless search and we don't believe it's a proper
8 search incident to arrest, it's not in plain view, I would
9 suggest that it's the government's burden, and I believe the
10 government has a witness here.
11      THE COURT: What I have in the record at this point in
12 time is apparently an accusation by the defendant that this
13 searching was going on before he was brought back to the room.
14 I also have evidence in the record that no such search was going
15 on, that the officers simply went back with him in the process
16 of getting clothes.
17      MS. LAVERTY: Uh-huh.
18      THE COURT: So at this point in time, the best I've
19 got is a suggestion in the record by an interested party that an
20 improper search occurred here.
21      MS. LAVERTY: All right.
22      THE COURT: That's all I've got right now.
23      (Defendant conferring with counsel.)
24      MR. CRONK: And there's no evidence seized. When the
25 agents went in and arrested Mr. Sievert, they didn't take

1  anything.
2              THE COURT: Exactly. I understand what counsel is
3  saying. She's saying they scoped it out on that occasion and
4  took it at a later time; however, they did take it with a
5  warrant. But I guess it's up to you, Counsel, what you want to
6  do in terms of what record you think I should have.
7              MS. LAVERTY: Okay. One moment.
8              (Counsel conferring with defendant.)
9              MS. LAVERTY: All right. Then we'll present the
10 testimony of the defendant.
11             THE COURT: Well, and before we do that, let me just
12 say, I assume Mr. Cronk has got an agent here that --
13             MR. CRONK: I have three agents here, Your Honor.
14             THE COURT: Yes, prepared to testify, and if what I'm
15 going to end up with here is the defendant saying that they were
16 searching in the room beyond a sweep search and then the
17 officers are going to say, no, that didn't happen, which is
18 consistent with the affidavit that I already have in the record,
19 if that is essentially the record I'm going to have today, do we
20 need to go through that exercise?
21             MS. LAVERTY: I guess I could make an offer of proof
22 then and leave it at that.
23             THE COURT: Because the problem that the court is
24 going to be confronted with is I'll have a disagreement as to
25 what happened out there, but on one side I'm going to have a

1 defendant with an obvious interest in how this comes out and on
2 the other side I'm going to have law enforcement officers that
3 if they're not somehow impeached or their credibility is somehow
4 attacked do not have a similar interest.  And if the court has
5 to make a credibility finding, I think we all know where that's
6 going to come down, if that's all I've got.
7             MR. CRONK:  One other matter, Your Honor, is if
8 Mr. Sievert is found by the court to not have been truthful
9 during his testimony here, then he risks an enhancement in his
10 sentence if he is ultimately convicted.
11            THE COURT:  Well, Ms. Laverty, she knows all of that
12 and I'm confident that she's had that discussion with her
13 client.
14            I just want to make sure that we're going through an
15 exercise that is going to be useful to everyone, including the
16 court.
17            MS. LAVERTY:  Why don't I make an offer of proof then,
18 and if the court desires additional testimony, we can talk about
19 it.
20            THE COURT:  Are you comfortable with the government
21 doing the same?
22            MS. LAVERTY:  Yes, sir.
23            THE COURT:  All right.  Then that seems to me as
24 reasonably acceptable.
25            Go ahead.

MS. LAVERTY: Thank you, Your Honor.

The instance that we're speaking about occurred on November 19, 2012, early in the morning hours. On that date officers arrived at the home of Bruce and Kathryn McChesney at a home in Louisa County, Iowa. Mr. McChesney answered the door, and the defendant, who was sleeping in a room just off the living room, joined him in the living room as or shortly after the agents entered the home. The defendant was advised that he was being arrested and was immediately placed in handcuffs by one or two of the officers.

Without him noticing at that point in time, it appears that two other agents had entered the home and went into what is the defendant's bedroom just off the main room of the house. The arresting officers noticed that defendant was still in his sleeping clothes. He would testify he was in boxer shorts or underwear and a T-shirt. It was decided that with the weather conditions he should change to more suitable clothing for the trip down to the county jail and he was then directed toward his room.

As the defendant entered his room, he observed one officer digging in a drawer of a dresser that's in that room and which contained exclusively the defendant's belongings. Another officer was going through the defendant's billfold or wallet and tossing items onto the bed. After that the second agent began poking around in the defendant's closet. These officers were

1 already engaged in these activities when the defendant saw them
2 in his room.  It's not an especially large room, but from the
3 point of view of someone standing in the living room, you would
4 have to get fairly close to the door of that room in order to
5 see in and see what was going on.
6     The defendant would state that he made no statements
7 to the officers about what he would like to wear or where those
8 items could be found.  He would also testify that there was a
9 pair of trousers or jeans on the floor next to the bed in a
10 fairly obvious spot.  Those jeans or trousers had contained the
11 billfold, so the officer that was going through the billfold
12 would have had to have picked up those pants already and looked
13 at them.  So there was no reason that the officers would have
14 needed to look in drawers or closet for clothing for him.  They
15 did ask if he had any shoes or where he had shoes, and he
16 replied that they were in the dryer, as in a clothes dryer.
17 That is the only statement that the defendant made to the
18 officers on that date.
19     When the defendant had changed into these trousers and
20 left the T-shirt on and left the home, there was still other
21 agents in the home.  And that was the extent of what the
22 defendant was able to identify that day.
23     He would also state that he rented this particular
24 room in this particular residence from Mr. and Mrs. McChesney.
25 Mr. McChesney is the defendant's former stepfather.  However,

the defendant regards Mr. McChesney as his father. He was paying $50 a week as rent and he had quite recently paid some rent or some money to Mr. McChesney perhaps as early as the day before. Mr. and Mrs. McChesney treated this room as the defendant's room. He had not a door but a curtain that hung over the doorway to the room. He kept his clothing in there. He spent time in there with a television and entertained guests in that room as well. That was sufficient to convey or to confer upon that room an expectation of privacy, and in that sense we believe that Mr. McChesney would not have had the ability to give consent to look into that room, if he had done so at all, which we don't know for sure.

The officers would not have -- the search would not have been excused by the plain view doctrine because these items that were ultimately found by the officers were not in plain view and, in fact, were somewhat secreted in various places in the defendant's room.

A protective sweep permits the defendants -- or the arresting officers to look around in the defendant's home to the extent that there might be someone hiding or who could jump out and attack the officers. Likewise, when officers make an arrest, they are permitted to examine the area immediately adjacent to the defendant as he's arrested out of safety precautions for the officers. For example, if there was a weapon in a drawer or under a box nearby, he could get to that,

1  and we don't believe that that exception would permit the search
2  either.
3          I do have some photographs, and counsel has these as
4  well.  They just depict a few views of the inside of the
5  defendant's room.  I think it would aid the court in perhaps
6  making a ruling, and I can offer them as Defendant's A, B, C, D,
7  and E.
8                          (Defendant's Exhibits A through E
9                           were offered in evidence.)
10         THE COURT:  Any objection to the photos, Mr. Cronk?
11         MR. CRONK:  I believe we provided those photos to her
12 and so I've seen them.  I don't know which ones she's referring
13 to, but I don't have any objection.  They're certainly
14 authentic.
15         THE COURT:  Exhibits A, B, C, D and E are admitted.
16                         (Defendant's Exhibits A through E
17                          were received in evidence.)
18         MS. LAVERTY:  Your Honor, I'll put the labels on the
19 back so as not to obscure the photographs.
20         THE COURT:  That's fine.
21         MS. LAVERTY:  And did I say A-1, 2, 3, 4, and 5 or --
22         THE COURT:  You said A, B, C, D and E.
23         MS. LAVERTY:  A, B, C, D and E, all right.
24         Your Honor, we believe the defendant would be able to
25 identify as well as the agents would be able to identify these

1   photographs.  In Exhibit A we see from the view of entering --
2   or standing in rather the living room of the residence, the main
3   room of the residence, looking toward the doorway that beyond
4   which is the defendant's primary area of occupation at his
5   exclusive use, toward the top of the photo, we see a red piece
6   of fabric that can be hanging from the ceiling to create an
7   obstruction or a doorway.  There's also a baby gate blocking
8   some access into that room.  We see in almost the middle of the
9   photo there's a red piece of cloth sitting on a box.
10         Then in Exhibit B we see the red piece of cloth again,
11  and this photo would show from within the defendant's bedroom
12  the first wall to the left, and we see a television.  It's a
13  plastic dresser or drawers with clothing inside.
14         Exhibit C, again turning towards the right of
15  defendant's bedroom, following around counterclockwise, we see
16  the same plastic set of drawers and a bed and on the far right a
17  wood and cloth chair on casters.
18         Then in D on the lower left, we see the same chair,
19  cloth and wood, and a bathroom.  At that point in time, there
20  was no wall or doorway between the defendant's room and the
21  bathroom as it was under construction.
22         And then Exhibit E, continuing on again
23  counterclockwise around the room, we see a number of plastic
24  tubs and another plastic set of drawers and a small night table
25  or piece of furniture with drawers in it.  Again, these were

1  places where the defendant kept his belongings.
2             All right.  So on Exhibit B the defendant would
3  identify the piece of furniture underneath the television --
4  it's difficult to see in the picture, but it's a very dark or
5  black color.  That was the piece of furniture that the defendant
6  observed one agent digging around in.
7             The closet is I don't think depicted or is not well
8  depicted in these photographs, but it is sort of behind and to
9  the right of the defendant's bed, and that was another place
10 that the agent was poking around.
11            (Defendant conferring with counsel.)
12            MS. LAVERTY:  That would conclude defendant's offer of
13 proof.
14            THE COURT:  Mr. Cronk.
15            MR. CRONK:  There's nothing to suppress.  During her
16 presentation there was nothing identified that was taken during
17 this sweep of the room.  I would take issue with one thing that
18 she said, and that is that she said that this room was for the
19 exclusive use of Mr. Sievert when that isn't true.  First of
20 all, Exhibit E that shows a photograph or a piece of artwork on
21 the wall of John Wayne, those bins there belong to Mr. and Mrs.
22 McChesney and he goes to the flea market and I've been advised
23 these are his flea market bins.
24            On Exhibit, I guess it's C, it shows the stripped bed
25 with the window and the covering up to the ceiling behind it.

1  At the top of the bed is a stack of, looks like a bookshelf, but
2  it's actually videos, and Bruce McChesney had an elaborate
3  collection of movies, John Wayne movies in particular, and
4  those -- this is a place where he stored his movies.
5           I would also indicate that -- I would also proffer,
6  Your Honor, the green suitcase that is depicted on the bin in
7  front of the white freezer, I think that's the McChesneys'
8  freezer in this room, and on that green suitcase, Mr. McChesney
9  placed the two cellular phones, the notebook and some other
10 papers.  That's how the FBI found them when they came back for
11 the search warrant because that's what these pictures come from.
12 They come from the 21st after they got a search warrant to come
13 back and seize these things.  None of those things were there
14 when they were in there arresting him the first time, and they
15 didn't find any evidence when they searched the first time --
16 when they were in there the first time.  When they did the
17 protective sweep and they collected his clothing and took him
18 out, they didn't seize anything.
19           THE COURT:  Thank you, Counsel.
20           Any additional argument?
21           MS. LAVERTY:  Yes, Your Honor.  On Exhibit E, the
22 plastic tubs that counsel referred to as being -- belonging to
23 Mr. McChesney and containing flea market finds, those were not
24 in the defendant's bedroom on the day that he was arrested on
25 November 19.

             Likewise, the suitcase in Exhibit B or C and the items on top of it were not as appears in the picture.  The suitcase was not on top of the plastic chest of drawers, and the papers and the phones and the notebook were not out in the home as such.

             (Defendant conferring with counsel.)

             MS. LAVERTY:  Finally, the freezer had been purchased by the defendant when he had worked for Maytag.

             The officers also might testify that he was asked to give ID or that ID was required when he went down to the jail, and the defendant would testify that he didn't have one.  He had applied for a CDL and it was in the mail at the time, so he didn't actually have any identification with him.

             (Defendant conferring with counsel.)

             MS. LAVERTY:  But they said that he wanted to bring to bring it with him or something like that, but he would not have said that because it didn't exist yet.

             THE COURT:  Anything further, Mr. Cronk?

             MR. CRONK:  No, Your Honor.

             THE COURT:  The record I have before me is insufficient for the court to be able to conclude that the search that the defendant describes actually occurred on the date of the arrest.  However, if it had occurred, I have no record upon which to conclude that items that were later obtained pursuant to the search warrant were identified on the

1  day of the arrest so that they could be searched later with a
2  warrant. And then, lastly, the items that ultimately were
3  obtained pursuant to a search warrant are relatively obvious
4  items in connection with the offense at issue.
5      So on the record that I have in this case, it seems to
6  me that there's no showing here that anything improper occurred
7  on the date of the arrest. Nothing was obtained on that date.
8  It was later obtained pursuant to a search warrant, and there
9  appears to be no connection between any observations made on the
10 date of the arrest and the application for the search warrant.
11     Accordingly, on the record before me, the motion to
12 suppress must be denied.
13     Anything further, Counsel?
14     MR. CRONK: I only want to make sure that we have as
15 part of our record, if this eventually is reviewed, the
16 application and affidavit in support of the search warrant.
17 That is filed under 3:12-mj-97. The court has a copy of the
18 search warrant, but the application --
19     THE COURT: I don't have the application.
20     MR. CRONK: And so --
21     THE COURT: Do you wish to make it an exhibit for
22 purposes of today?
23     MR. CRONK: I certainly can. I believe I have the
24 original here.
25     MS. LAVERTY: Cliff, I might have a copy if you would

```
 1  rather.
 2          MR. CRONK:  That's fine.  I will mark this as Exhibit
 3  1.
 4                          (Government Exhibit 1 was
 5                           offered in evidence.)
 6          THE COURT:  Any objection to Exhibit 1?
 7          MS. LAVERTY:  No objection to 1.
 8          THE COURT:  All right.  1 is admitted.
 9                          (Government Exhibit 1 was
10                           received in evidence.)
11          THE COURT:  Anything else, Ms. Laverty?
12          MS. LAVERTY:  No, Your Honor.
13          THE COURT:  All right.  I'll give these to the clerk
14  for proper handling.
15          All right.  Thank you.
16          Court is in recess.
17          (Proceedings concluded at 3:00 p.m.)
18
19
20
21
22
23
24
25
```

1           C E R T I F I C A T E

2           I, the undersigned, a Certified Shorthand Reporter of

3  the State of Iowa, do hereby certify that I acted as the

4  official court reporter at the hearing in the above-entitled

5  matter at the time and place indicated.

6           That I took in shorthand all of the proceedings had at

7  the said time and place and that said shorthand notes were

8  reduced to computer transcription under my direction and

9  supervision, and that the foregoing computer transcription pages

10 are a full and complete transcript of the shorthand notes so

11 taken.

12          Dated at Des Moines, Iowa, this 10th day of June,

13 2014.

14

15

16

17                            /s/ Terri L. Martin
                              _____
                              CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25